UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE ESTATE OF THOMAS LANE | : | |
| | : | |
| Plaintiff, | : | DOCKET NO.  3:17cv1134 |
| | : | |
| v. | : | |
| | : | |
| CITY OF WEST HAVEN | : | |
| CHIEF OF POLICE, JOHN KARAJANIS | : | |
| SERGEANT JOSEPH D'AMATO | : | |
| STATE TROOPER JUSTIN C. LUND | : | |
| STATE TROOPER Lt. ERIC PECK | : | July 7, 2017 |
| | : | |
| Defendants. | : | |

COMPLAINT

Plaintiff, by and through his attorneys, Formica Williams, P.C., affirms that this action is brought by the Estate of Thomas Vincent Lane, Jr. through its administrator Brandon Michael Lane to redress the excessive and unreasonable use of force and the wrongful death of Mr. Lane on February 22, 2016, while he was trapped in his motor vehicle. Certain police officers and state troopers intentionally hit him four times with police tasers during the failed custodial arrest. This action also seeks to redress for conspiracy to deny Mr. Lane the due process of law by constructively concealing the facts surrounding his wrongful death.

As alleged herein, the Defendants, certain named Police Officers of the City of West Haven and certain named State Troopers of the State of Connecticut, violated Mr. Lane's rights under the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution as enforced through 42 U.S.C. §§ 1983 and 1988, and the deprivation of Mr. Lane's liberty without the due process of law, in violation of the Fourteenth Amendment.  Mr. Lane also asserts state law claims alleging violations of the Connecticut Constitution article first, §§ 7 and 9; assault and battery; recklessness and

maliciousness; negligence; negligent infliction of emotional distress; intentional infliction of emotional distress; and municipal liability for the aforesaid under Conn. Gen. Stat. § 52-557n.

## I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the claims for deprivation of constitutional rights under 28 U.S.C. §§ 1331 and 1343; under 42 U.S.C. §§ 1983 and 1988; and this Court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367 and state law for wrongful death, Conn. Gen. Stat. § 52-555. Jurisdiction supporting Mr. Lane's claims for attorney fees is conferred by and brought pursuant to 42 U.S.C. § 1391(b).

2.    Venue is Proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because: (1) all Defendants reside within the judicial district, and (2) all of the events giving rise to this Complaint occurred in this judicial district.

## II.    PARTIES

3.    The Plaintiff, Estate of Thomas Vincent Lane, Jr. by his administrator Brandon Michael Lane. (Derby, Connecticut Probate Court), the deceased is an African American individual.

4.    Defendant, State Trooper Justin C. Lund, is a State Trooper and employee of the State of Connecticut.  Trooper Lund is being sued in his official and individual capacity. (Also referred herein as one of the "Defendant Officers" when actions and allegations refer to the Tasering of Mr. Lane.)

5.    Defendant, State Trooper Lt. Eric Peck, is a State Trooper and employee of the State of Connecticut. State Trooper Peck is being sued in his official and individual capacity.

6.      Defendant, the City of West Haven, is a municipality in the County of New Haven created and existing as a political subdivision of and in the State of Connecticut.

7.      Defendant, Police Sergeant Joseph D'Amato, is and was at all times relevant hereto a police officer of the West Haven Police Department, having his principal business address at 200 Saw Mill Road, West Haven, Connecticut and is alleged to have acted under color of statute, ordinance, regulation, custom or usage of the State of Connecticut.  Sergeant D'Amato is being sued in his official and individual capacity. (Also referred herein as one of the "Defendant Officers" when actions and allegations refer to the Tasering of Mr. Lane.)

8.      Defendant, the Chief of West Haven Police, John Karajanis, having his principal business address at 200 Saw Mill Road, West Haven, Connecticut and is alleged to have acted under color of statute, ordinance, regulation, custom or usage of the State of Connecticut.  Chief Karajanis is being sued in his official and individual capacity.

### III.      ALLEGATIONS OF FACTS

9.      State Trooper, Lt. Peck of the major crime squad and the State of Connecticut Police CARS Unit investigated the motor vehicle accident and use of force against Mr. Lane on February 22, 2016.  He reported the following facts to Kevin Lawlor, Assistant State's Attorney for the State of Connecticut (the "Investigation"), which are reported *verbatim* here:

A.      On Monday, February 22, 2016, at approximately 12:58 a.m., Connecticut State Police (CSP) personnel responded to an automobile accident on 1-95 Northbound near the Exit 42 on-ramp in West Haven.

B.     Trooper Justin Lund was first on the scene and observed a 2006 Jeep Commander, split in two pieces, at rest in the grassy area between I-95 and the on-ramp. He located the single occupant and driver, Thomas Lane, trapped in the driver's seat of the wreckage of the passenger compartment. He observed Mr. Lane suffered from a severe laceration of his head which was described as a "scalping" which revealed his skull. Trooper Lund attempted to keep Mr. Lane calm and reported to CSP communications personnel to "step up" ambulance and EMR personnel to assist Mr. Lane.

C.     Trooper Lund then observed a fire burning nearby.  This fire was in the severed engine compartment of the Jeep and posed a hazard to the victim as well as first responders. Trooper Lund quickly retrieved his fire extinguisher from his cruiser and extinguished the fire.

D.     The second vehicle involved, a commercial 2006 Freightliner tractor-trailer operated by James Lubwama, was parked nearby. This vehicle suffered very minor damage to the rear left portion of the truck.

E.     It was subsequently determined by the CARS Unit that the Jeep was operating in the left lane of I-95 Northbound when it swerved suddenly and impacted the rear left area of the tractor-trailer which was being operated in the center lane. The Jeep crossed in front of the truck, struck the metal beam guide rail, penetrated the rail and struck a support pole for an overhead highway sign severing the Jeep in two pieces.

F.     Shortly thereafter, several other members of the CSP, West Haven Police Department, West Haven Fire Department and American Medical Response arrived on scene. At this time, WHFD took charge to extricate Mr. Lane and

begin immediate life-saving efforts to his severe wounds. Other firefighters began to deploy hoses and prevent any further fires from igniting.

G.      During the initial extrication process, WHFD Lt. William Heffernan and Firefighter Shawn Uscilla, began to employ a power cutting tool to remove the driver's side door and gain access to Mr. Lane. Mr. Lane began to reach out of the driver's side window area and began to grab at FF Uscilla, impeding his rescue efforts and exposing Mr. Lane to further injury from the rescue apparatus. Lt. Heffernan grasped Mr. Lane's arm to place it safely within the vehicle. At this point, Mr. Lane grabbed Lt. Heffernan's left hand with both hands and began to forcefully pull his fingers apart.

H.      Lt. Heffernan began to scream in pain and yell "Let go! Let go!" Several members of the WHFD as well as others immediately ran to Lt. Heffernan's aid. After struggling with Mr. Lane for a period of time, they freed Lt. Heffernan from Mr. Lane's grasp. Subsequent medical treatment provided to Lt. Heffernan revealed that he suffered two fractured fingers as a result of the assaultive behavior of Mr. Lane.

I.      Once Lt. Heffernan was freed from Mr. Lane's grasp, rescue efforts stopped and Law Enforcement Officers attempted to quickly determine the next appropriate step to safely extricate Mr. Lane.  At this same moment, Mr. Lane appeared to grasp a sharp bladed object which was subsequently identified as a shard of mirrored glass in his right hand.

J.      Law enforcement and Rescue personnel surrounding the car then observed Mr. Lane begin to cut his left wrist with the shard of glass. He appeared to cut deeply into his wrist causing extreme loss of blood and exposing tendons

5

and bone to the sight of the nearby officers. Those surrounding the car pleaded with him to drop the glass. At no time during this portion of the incident did Mr. Lane vocalize any response.

K.      At this point, rescue personnel could not safely extricate Mr. Lane. Trooper Lund and fellow Troopers quickly determined that some action was required to prevent Mr. Lane from continuing his attempts to harm himself or further harm on-scene personnel. Trooper Lund determined that use of his baton or chemical spray would be ineffective.  Lt. Heffernan requested Trooper Lund to deploy his Taser to prevent further harm to Mr. Lane. Trooper Lund made the split-second determination that the use of his issued Taser would possibly cause Mr. Lane to drop the shard of glass and prevent further possible life-threatening injury.

L.      Trooper Lund deployed his Taser and discharged a five second electric cycle which momentarily caused Mr. Lane to stop cutting his wrist.  He did not drop the glass shard.  Mr. Lane immediately pulled the Taser wires from his body which prevented Trooper Lund from engaging another cycle.

M.      Mr. Lane again began to harm himself. Trooper Lund reloaded his Taser and discharged another five second cycle. Mr. Lane had a similar response and did not drop the glass. He again pulled the Taser wires from his body.  He then continued to cut his wrist and also began to cut his neck.

N.      During this period of time, Lt. Heffernan ordered Fire and Rescue personnel to ready a sedative to Mr. Lane. A sedative consisting of Haloperidol and Midazolam was prepared and given to Paramedic Heather Gebhardt. Paramedic Gebhardt positioned herself on the passenger side of the vehicle and waited for an opportunity to safely administer the sedative to

Mr. Lane.

O.      After Trooper Lund's second Taser deployment, he had no further cartridges to deploy. He quickly noticed that WHPD Sgt. D' Amato who had recently arrived on scene was also carrying his Department issued Taser. He requested Sgt. D'Amato deploy his Taser immediately to disarm Mr. Lane. Sgt. D' Amato quickly determined this was necessary to prevent further harm to Mr. Lane or those on-scene and he took a position to the front of the vehicle and deployed his Taser. He stated he discharged two five second cycles and Mr. Lane dropped the glass.   Sgt. D' Amato's Taser download indicates four cycles.

P.      Mr. Lane then appeared to be looking to his lap to retrieve the glass shard.  Paramedic Gephardt used this opportunity to reach in the vehicle and safely inject Mr. Lane with the sedative. It took several minutes for the medication to have the desired effect. Once Mr. Lane appeared to calm down, rescue efforts resumed.  During this period, Mr. Lane became unresponsive and once removed from the vehicle was found to have no pulse. It took approximately ten minutes to remove him from the crumpled vehicle due to the condition of the vehicle and Mr. Lane's large frame. Firefighters and rescue personnel noted that he had lost an extreme amount of blood from the wounds sustained in the crash as well as those from his self-inflicted wound to the wrist.

Q.      Once in the custody of medical personnel, Mr. Lane had lacked vital signs for a period of several minutes. The AMR medical crew continued treatment and transported Mr. Lane to Yale-New Haven Hospital where he was pronounced deceased at 1:57 a.m.

R.      On February 22, 2016, an autopsy was performed on Thomas Lane by

Manra DeJoseph, D.O., Deputy Chief Medical Examiner. Her report concluded Thomas Lane sustained severe injuries caused by the motor vehicle accident including but not limited to Cutaneous Contusions and a gaping laceration to the head, fractured sternum, ribs, vertebrae and pelvis; pulmonary contusions; and avulsion of bladder and pelvis. He also suffered post collision self-inflicted injuries including incised wounds of the left wrist which caused an ulnar artery incision and superficial incised wounds of the neck. Furthermore, he received superficial injuries to his right palm and fingers which appear consistent with grasping a sharp object such as a shard of glass.

S.     Toxicology results indicated the presence of Ethanol (Ethyl Alcohol) BAC .06, Diphenhydramine and Oxycodone-Free in his blood. Ethanol is a nervous system depressant, Diphenhydramine is an antihistamine with sedative and anti-emetic effects and oxycodone is a narcotic analgesic used to control pain.

T.     The cause of death was determined to be "Incised wounds of the upper extremity and blunt trauma to the head and torso. Manner of Death was determined to be "Suicide (Cut-self after motor vehicle collision with fixed objects)".

U.     Further relevant investigation by CSP revealed that Mr. Lane has a family history of mental health issues. It was also reported to CSP that Mr. Lane had recently been acting strangely. He had expressed increasing paranoid ideation. He had expressed concerns that the government had been watching him. He also indicated to family that he believed his house was bugged and had deleted his Facebook account. He believed family members were responsible for the bugging of his phone. The night of the accident he also expressed concern to his son that his cellphone was somehow connected

8

to his Xbox. Lastly, he apparently left his home in the middle of the night, without telling anyone where he was going, leaving behind his wallet and identification and crashed his vehicle 12 miles from his home. While not definitive, this irrational behavior which was occurring prior to the accident provides a possible explanation for Mr. Lane's erratic and assaultive behavior at the scene.

10. Lt. Peck's findings on the facts were facially inconsistent and demonstrated a particular bias in many material ways including the following:

A. Lt. Peck's finding that: "Mr. Lane appeared to grasp a sharp bladed object which was subsequently identified as a shard of mirrored glass in his right hand." But the "sharp edged glass" that reportedly came from the rear-view mirror would objectively have been too small to be confuse as a "blade."

B. Trooper Lund's finding was: "a sharp object, which appeared to be a blade. The object was held in the operator's right hand, with a sharp, pointed edge protruding from his hand's grasp."  But the rear-view mirror had obvious rounded edges.

C. The Investigation justifies the use of repeatedly ineffective taser charges on Mr. Lane based on the alleged danger to rescue personnel injecting him with a sedative; but Mr. Lane was subdued when a female paramedic entered the vehicle and injected him with a sedative after four separate taser firings failed to allegedly stop him from self-harm.

D. The Investigation attempts to characterize Mr. Lane as intoxicated and his actions consistent with intoxication, but the autopsy report found a Blood Alcohol Content (BAC.06), which is below the legal threshold for intoxication.

E.      The Investigation attempts to link drug and alcohol containers found outside the vehicle to support Trooper Lund's conclusion that "based upon my training and experience, I recognized the operator's actions, under these circumstances, to be indicative of a person whom is/could be under the influence of alcohol and/or drugs."  But there is no evidence other than the proximity of the containers to the crash to connect them to Mr. Lane's use.

F.      The Investigation emphasized alcohol and drugs both at the scene of the accident and the limited presence in Mr. Lane's blood to justify the deadly use of force by Defendants Trooper Lund and Sgt. D'Amato.  But the Defendant Officers could not reasonably have surmised the use of drugs and alcohol at the time they deployed their Tasers.

G.      The Investigation concluded that Mr. Lane was mentally ill and suicidal, but failed to consider that he was wearing a seatbelt at the time of the accident, which is plainly inconsistent with a vehicular suicide intent.

H.      The Investigation concluded that Mr. Lane was suicidal, in part, because of the time of night, that he had allegedly left his house without telling anyone where he was going, and without his wallet; but failed to recognize the presence in his vehicle of a pizza box from Santini's Pizza Palace, Ansonia, Connecticut (approximately 22 minutes from the crash location), as well as $8.00 in cash.

I.      The investigation reported that Mr. Lane had paranoid ideation with a belief that the government had been watching him; but fails to connect whether this knowledge of Mr. Lane's mental state (if true and corroborated) would have been known to the Defendant officers at the accident scene when they decided to use Tasers to subdue him.

J.     The investigation does not recognize that when the Defendant officers found Mr. Lane, he was in shock and panic, as it was obvious that he was: in a vehicle that had been severed in half from a violent impact; the vehicle was on fire; the back of his head had been severed; and he was suffering from crush wounds; all while being trapped by the vehicle.

K.     The investigation also inconsistently reports that Mr. Lane was trapped in his vehicle with his legs pinned by the crumpled zone of the steering wheel and roof and door and specifically identifies him as being "immobilized;" but at the same time presented a danger to himself and other rescue personnel on the scene.  This does not square with the fact that a sedative was safely administered to him from behind his seat by rescue personnel after the Defendant Officers Tasered him four times without effect.

L.     The investigation fails to explain why the Defendant Officers could not use Mr. Lane's immobilized status to disarm him manually of any sharp objects, such as handcuffs or ties.

M.     The investigation does not recognize or consider that by tasering a trapped individual four times, they were increasing Mr. Lane's adrenal levels and sending him into further panic and hysteria that would likely cause him injury or death.

N.     The investigation fails to explain why it was reasonable to taser Mr. Lane multiple times, when the Taser was clearly not effective the first time.

O.     The investigation fails to explain why other, less deadly methods, were not being used in an escalation to near deadly force to subdue Mr. Lane if he was in fact trying to harm himself.

11.     The factual investigation by Lt. Peck was done with partiality and bias directed toward protecting the legal interests of other named Defendants in this action

including the State of Connecticut, the Connecticut State Police, and the West Haven Police Department in that the investigation:

A.      Draws unsupported factual conclusions to justify the use of the tasers when other less deadly force options were clearly available, such as pharmaceutical sedation.

B.      Attempts to find circumstances, such as the mental state of Mr. Lane, after his death, to justify the actions of the Defendant Officers at the time of the accident.

C.      Attempts to link drug and alcohol as a behavioral cause of Mr. Lane's actions at the scene of the accident, when such a conclusion is clearly refuted by subsequent toxicology reports.

D.      Fails to consider the unreasonableness of tasering a trapped, injured, and clearly panicked individual who is in fear for this life.

E.      Surmises a false and unsupported motive of suicidal intent in Mr. Lane so as to deflect civil liability from the actions of the defendant officers, the City of West Haven, and the State of Connecticut.

F.      Fails to inquire as to whether the use of Tasers would have caused death rather than the alleged self-inflicted injuries; and cannot explain the proximity in time of Mr. Lane's death to use of Tasers.

12.      Mr. Lane has been denied the due process of law by an investigation into his arrest and subsequent death, which was caused in whole or in part by the use of deadly force of multiple Taser deployments.

IV.     <u>ALLEGATIONS</u>

COUNT I:     <u>1983 CONSPIRACY ALL DEFENDANTS</u>

13.     Paragraphs 1 through 12, inclusive of the foregoing are hereby incorporated as if recited in full herein.

14.     Upon Defendant Officers realizing that they had critically injured Mr. Lane, they intentionally conspired to cover-up their unlawful acts by providing false and fictitious information to the authorities and to the media regarding the death of Mr. Lane, including falsely claiming that his death was by suicide rather than from four deployments of Tasers to a person who was suffering serious injuries.

15.     Defendant Officers acted in concert to cover-up the facts and circumstances of the fatal Tasering of Mr. Lane.

16.     As soon as the Defendant Officers realized that they had Tasered Mr. Lane to death, they mutually, either tacitly or overtly, agreed to commence a conspiracy to cover-up the facts of what they had done.

17.     The Defendant Officers' conspiracy deprived Mr. Lane and his family their constitutional rights.

COUNT II:     <u>AS TO DEFENDANT OFFICERS: Pursuant to 42 U.S.C. 1983</u>
             <u>(Violation of Fourth Amendment, Excessive Force)</u>

18.     Paragraphs 1 through 17, inclusive of the foregoing, are hereby incorporated as if recited in full herein.

19.     The Defendant Officers used physical force or a show of authority to restrain the liberty of Mr. Lane.

20.     The force or show of authority used by the Defendant Officers was unreasonable in light of the circumstances then and there present.

21.    The Defendant Officers violated Mr. Lane's rights secured under the Fourth and Fourteenth Amendment to the United States Constitution, as enforced through 42 U.S.C. § 1983 and 1988, because the use of force or show of authority was objectively unreasonable.

22.    The excessive force caused extensive injuries and damages to the Plaintiff, not least of which is the death of Mr. Lane.

COUNT III:    <u>AS TO DEFENDANT OFFICERS: Pursuant to 42 U.S.C. 1983 (Unlawful Seizure in Violation of Fourth and Fourteenth Amendment)</u>

23.    Paragraphs 1 through 22, inclusive of the foregoing are hereby incorporated as if recited in full herein.

24.    The Defendant Officers, acting under the color of state law, made an arrest of Mr. Lane without probable cause, and without recognizing his immediate circumstances and the panic as to his immediate physical condition.

25.    The Defendant Officers did not have probable cause to arrest or detain Mr. Lane.

26.     Mr. Lane was injured and died as a consequence of the Defendant Officers' unlawful seizure, including cardiac arrest and emotional and physical trauma caused by an unlawful and unjustified Tasering.

27.    The Defendant Officers deprived Mr. Lane of his right to be free of unreasonable searches and seizures under the Fourth and Fourteenth Amendment to the United States Constitution as enforced through 42 U.S.C. §§ 1983 and 1988.

COUNT IV.    <u>AS TO DEFENDANT OFFICERS: Pursuant to 42 U.S.C. 1983 (Unreasonable Seizure in Violation of Fourth and Fourteenth Amendment)</u>

28.    Paragraphs 1 through 27, inclusive of the foregoing are hereby incorporated as if recited in full herein.

29.     Without probable cause, Mr. Lane was arrested and suffered an excessive use of force in his detention by the Defendant Officers.

30.     Intentionally and with malice, the Defendant Officers used excessive force and caused Mr. Lane to suffer injury, emotional trauma, and death.

31.     The excessive and unreasonable amount of force used against Mr. Lane caused him to be deprived of rights secured by the United States Constitution under the Fourth and Fourteenth Amendments as enforced through 42 U.S.C. §§ 1983 and 1988.

COUNT V.   AS TO DEFENDANT OFFICERS: Pursuant to 42 U.S.C. 1983 (Deprivation of Equal Protection in Violation of Fifth and Fourteenth Amendment)

32.     Paragraphs 1 through 31 inclusive of the foregoing are hereby incorporated as if recited in full herein.

33.     Mr. Lane was similarly situated to other persons residing in the City of West Haven and State of Connecticut who have been involved in motor vehicle accidents.

34.     Mr. Lane was treated differently than other similarly situated individuals in that:

A.     The Defendant Officers did not render aid to him in the same manner they would have rendered to a person who was not of color;

B.     The Defendant Officers escalated to the deadly force of multiple Taser deployments because Mr. Lane was a large African American individual (and based upon the Defendant Officer's latent or overt biases and lack of training), perceived a more dangerous individual than was objectively in the situation then and there existing;

C.     The Defendant Officers would not have Tasered a white person in the same situation;

D.     The Defendant Officers and the investigation would not have used the pretext of drug and alcohol and mental state to justify the use of excessive force; as such pretexts were based upon racial stereotypes.

E.     If Mr. Lane was a white individual, there would be no attempt to justify the impermissible use of excessive force in an accident situation as was involved on February 22, 2016.

F.     There is no other case known where a white person was Tasered in a situation such as Mr. Lane; and statistically, African American citizens such as Mr. Lane, are proportionally more likely to be Tasered than their white counterparts during interactions with the police.

35.     The Defendant Officers selectively enforced the manner of their arrest based upon Mr. Lane's race.

36.     Mr. Lane was denied equal protection under the law in violation of the Fifth and Fourteenth Amendments to the United States Constitution as enforced through 42 U.S.C. §§ 1983 and 1988.

COUNT VI:     AS TO DEFENDANT OFFICERS: VIOLATION OF CONNECTICUT STATE CONSTITUTION.

37.     Paragraphs 1 through 36 inclusive of the foregoing are hereby incorporated as if recited in full herein.

38.     The Defendant Officers unlawfully deprived Mr. Lane of rights secured to him by the Connecticut Constitution as a result of the excessive use and unreasonable use of force and arrest without probable cause.

39.     The conduct of the Defendant Officers was unlawful and in violation of Article First, §§ 8 and 9, of the Connecticut Constitution.

COUNT VII:  AS TO DEFENDANT OFFICERS: ASSAULT AND BATTERY.

40.     Paragraphs 1 through 39 inclusive of the foregoing are hereby incorporated as if recited in full herein.

41.     The Defendant Officers forcefully threatened and Tasered Mr. Lane with the intention of placing him in apprehension of imminent serious bodily harm or death.

42.     The Defendant Officers intended to injure and did in fact injure Mr. Lane in an offensive and harmful manner.

43.     As a result of the conduct of the Defendant Officers, Mr. Lane was in fact put in apprehension of imminent serious bodily harm and death.

44.     The conduct of the Defendant Officers constituted an assault and battery upon Mr. Lane as it was objectively unreasonable under the circumstances then and there existing.

45.     The personal injuries and losses complained of by Mr. Lane were the direct and proximate result of said assault and battery.

COUNT VII:  AS TO DEFENDANT OFFICERS: RECKLESSNESS AND MALICIOUSNESS.

46.     Paragraphs 1 through 45 inclusive of the foregoing are hereby incorporated as if recited in full herein.

47.     The conduct of the Defendant Officers was not ordinary and customary for the arrest and detention of a criminal suspect in Mr. Lane's physical condition and position.

48.     The Defendant Officers were reckless and malicious in one or more of the following ways:

A.      The Defendant Officers intentionally used force against Mr. Lane without legal or probable cause or justification;

B.     The Defendant Officers effected an arrest of Mr. Lane without legal or probable cause or justification where no arrest was warranted;

C.     The Defendant Officers assaulted Mr. Lane without legal or probable cause or justification;

D.     The Defendant Officers recklessly and wantonly used excessive and unreasonable force against Mr. Lane and failed or refused to act to prevent each other Defendant from using excessive and unreasonable force against Mr. Lane;

E.     The conduct of the Defendant Officers was done with the intent of inflicting bodily injury and without any useful purpose for the arrest and detention of a criminal suspect.

F.     Took direction from an unqualified individual on the use of appropriate force in that the Defendant Officers Tasered Mr. Lane at the direction of Lt. William Heffernan of the West Haven Fire Department.

49.     The personal injuries and losses complained of by Mr. Lane were the direct and proximate result of said recklessness or maliciousness.

COUNT VIII:  AS TO DEFENDANT OFFICERS: NEGLIGENCE.

50.     Paragraphs 1 through 49 inclusive of the foregoing are hereby incorporated as if recited in full herein and apply to all but the State Trooper Lund and the State of Connecticut.

51.     The Defendant Officers failed to observe the ordinary and usual standard of care in the apprehension and detention of a Mr. Lane.

52.     The Defendant Officers failed to observe the customary and ordinary use of force proportional to the resistance of a criminal suspect in Mr. Lane's position and condition.

18

53.     The Defendant Officers were negligent in one or more of the following ways:

A.     They arrested Mr. Lane without probable cause;

B.     The Defendant Officers restrained and assaulted Mr. Lane without justification or provocation;

C.     The Defendant Officers each used excessive and unreasonable force against Mr. Lane and failed or refused to act to prevent each other from using excessive and unreasonable force against Mr. Lane;

D.     The Defendant Officers failed to use less injurious and dangerous methods to restrain Mr. Lane.

E.     The Defendant Officers took direction on the appropriate use of force from an unqualified individual such as Lt. William Heffernan of the West Haven Fire Department.

54.     The personal injuries and death of which Mr. Lane complains were the direct and proximate result of said malicious and reckless conduct.

COUNT IX:   <u>AS TO DEFENDANT OFFICERS: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>

55.     Paragraphs 1 through 54 inclusive of the foregoing are hereby incorporated as if recited in full herein.

56.     The Defendant Officers each knew or should have known that their acts and omissions, including intentionally Tasering a trapped, injured, and panicked individual, involved an unreasonable risk of causing emotional distress and fear of death to Mr. Lane.

57.     As a direct and proximate result of said acts or omissions, Mr. Lane suffered emotional distress and fear of death.

COUNT X:   AS TO THE CITY OF WEST HAVEN CHIEF OF POLICE JOHN KARAJANIS

58.     Paragraphs 1 through 57 inclusive of the foregoing are hereby incorporated as if recited in full herein.

59.     At all times relevant hereto, the Defendant Officers were under the command, control, and direction of the City of West Haven Police Department and its Police Chief, John Karajanis.

60.     Chief Karajanis failed to secure to Mr. Lane, unlawfully deprived Mr. Lane, or caused Mr. Lane to be unlawfully deprived of rights secured to him by the United States Constitution and 42 U.S.C. § 1983 and 1988 in one or more of the following ways:

A.     He failed or refused to promulgate and enforce appropriate guidelines, trainings, regulations, policies, practices, procedures or customs regarding the appropriate use of Tasers by the Defendant Officers;

B.     He failed or refused to promulgate and enforce appropriate guidelines, trainings, regulations, policies, practices, procedures or customs regarding the use of Tasers against persons in Mr. Lane's position by the Defendant Officers;

C.     He failed or refused to promulgate and enforce guidelines, regulations, policies, practices, procedures or customs regarding the training of the Defendant Officers in the performance of their duties and general conduct toward persons in Mr. Lane's position;

D.     He failed or refused to recognize the dangerous propensities of Sgt. D'Amato and to take corrective disciplinary or educational actions regarding such dangerous propensities in regard to using Tasers;

20

E.      He failed or refused to recognize the emotional fatigue and stress of Sgt. D'Amato and to adequately address such fatigue and stress when he knew or should have known such a condition was likely to lead to the excessive use of force against individuals such as Mr. Lane.

F.      He failed to establish a policy for independent investigation of police misconduct cases and has relied on self-interested investigator(s) to produce findings that conceal and fail to reveal officer misconduct.

61.     The personal injuries and death complained of by Mr. Lane were the direct and proximate result of the aforementioned failures by the Chief Karajanis.

COUNT XI:      <u>AS TO THE CITY OF WEST HAVEN AS FOR NEGLIGENCE OF ITS AGENTS AND EMPLOYEES PURSUANT TO CONN. GEN. STAT. § 52-557n</u>

62.     Paragraphs 1 through 61 inclusive of the foregoing are hereby incorporated as if recited in full herein.

63.     At all times relevant hereto, Sgt. D' Amato was acting as an agent and employee of the City of West Haven in the performance of his ministerial acts and duties.

64.     Sgt. D'Amato was negligent in the performance of his ministerial acts and duties in one or more of the following ways:

A.      He arrested Mr. Lane without probable cause;

B.      He restrained and assaulted Mr. Lane without justification or provocation;

C.      He deployed his Taser against Mr. Lane in an unreasonable use of force and for an improper purpose.

D.      He used excessive and unreasonable force against Mr. Lane and failed or refused to act to prevent Trooper Lund from using excessive and unreasonable force against Mr. Lane.

E.      He took direction on the appropriate use of force from an unqualified individual such as Lt. William Heffernan of the West Haven Fire Department.

E.      He used his Taser for the improper purpose of sedating a trauma victim - Mr. Lane - who was in acute distress and needed appropriate medical attention.

65.     At all times relevant hereto, Chief of Police Karajanis was acting as an agent and employee of the City of West Haven in the performance of ministerial acts and duties.

66.     Chief Karajanis was negligent in the performance of his ministerial acts or duties in any one or more of the following ways:

A.      He failed or refused to promulgate and enforce appropriate guidelines, trainings, regulations, policies, practices, procedures or customs regarding the arrests of persons by Sgt. D'Amato and other West Haven Police Officers;

B.      He failed or refused to promulgate and enforce appropriate guidelines, trainings, regulations, policies, practices, procedures or customs regarding the use of force against persons by Sgt. D'Amato and other West Haven Police Officers;

C.      He failed or refused to promulgate and enforce guidelines, regulations, policies, practices, procedures or customs regarding the training of the Sgt. D'Amato and other West Haven Police Officers in the performance of their duties and conduct toward persons in Mr. Lane's situation;

22

D.    He failed or refused to recognize the dangerous propensities of Sgt. D'Amato in the proper use of Tasers and to take corrective disciplinary or educational actions regarding such dangerous and violent propensities;

E.    He failed or refused to recognize the emotional fatigue and stress of Sgt. D'Amato and to adequately address such fatigue and stress when he knew or should have known such a condition was likely to lead to the excessive use of force against individuals such as Mr. Lane.

F.    He failed to establish a policy for independent investigation of police misconduct cases and has relied on self-interested investigator(s) to produce findings that conceal and fail to reveal officer misconduct.

E.    He failed to sufficiently train, supervise, or establish policies that would have prevented his police officers from taking direction from an unqualified individual, such as Lt. William Heffernan on the appropriate use of force.

67.    The personal injuries and death of which Mr. Lane complains were the direct and proximate result of said negligence.

68.    The City of West Haven is liable for the actions and conduct pursuant to Conn. Gen. Stat. § 52-557n.

COUNT XII:    AS TO THE CITY OF WEST HAVEN FOR INDEMNIFICATION PURSUANT TO CONN. GEN. STAT. § 7-465

69.    Paragraphs 1 through 68 inclusive of the foregoing are hereby incorporated as if recited in full herein.

70.    The City of West Haven is liable to pay on behalf of its employees the Sgt. D'Amato and Chief of Police Karajanis, all sums which each become obligated to pay by reason of liability being imposed upon such employee by law for damages awarded for

the infringement of the civil rights and physical damages to the person or property of the Plaintiffs pursuant to Conn. Gen. Stat. § 7-465.

## REQUEST FOR JURY TRIAL

71     Mr. Lane, by and through his attorneys, Formica Williams, P.C., hereby request a trial by jury in the above-captioned matter.

WHEREFORE, the Plaintiffs claim:

1.     Monetary damages of not less than Two Million Dollars;

2.     Punitive damages;

3.     Attorney fees and costs provided by 42 U.S.C. § 1988;

4.     Indemnification pursuant to Conn. Gen. Stat. § 7-465; and

5.     Such other relief in law or equity as the Court may deem appropriate.

Dated at New Haven, Connecticut on this 7th Day of July, 2017.

PLAINTIFFS:

/s/

By: Glenn L. Formica, CT21053
Formica Williams, P.C.
195 Church Street, 11th Floor
New Haven, Connecticut 06510
Telephone: (203) 789-8456
Facsimile: (203) 787-6766
E-Mail: gformica@formicalaw.com